Slip Op. 10-95

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
-------------------------------------------------------x
                                                       :
ESSAR STEEL LIMITED,                                   :
                                                       :
            Plaintiff,                                 :
                                                       :
      v.                                               :
                                                       :
UNITED STATES,                                         :
                                                       :
            Defendant,                                 :
                                                       :
      and                                              :
                                                       :
UNITED STATES STEEL                                    :
CORPORATION,                                           :
                                                       :
            Defendant-Intervenor.                      :
                                                       :
-------------------------------------------------------x
```

**Before: Judith M. Barzilay, Judge**
**Court No. 09-00197**
**Public Version**

## OPINION

[The court grants in part and denies in part Plaintiff's Motion for Judgment Upon the Agency Record and remands the case to the U.S. Department of Commerce for further proceedings.]

*Arent Fox LLP* (*Mark P. Lunn*, *Kay C. Georgi* and *Diana Dimitriuc Quaia*) for Plaintiff Essar Steel Limited.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David D'Alessandris*) for Defendant United States; *Deborah R. King*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

*Skadden Arps Slate Meagher & Flom, LLP* (*Robert E. Lighthizer*, *Jeffrey D. Gerrish* and *Nathaniel B. Bolin*) for Defendant-Intervenor United States Steel Corporation.

Dated: August 19, 2010

Barzilay, Judge:  Plantiff Essar Steel Limited ("Essar") contests the final results of the sixth administrative review of the countervailing duty order on certain hot-rolled carbon steel flat products from India.  *Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, 74 Fed. Reg. 20,923 (Dep't Commerce May 6, 2009) ("*Final Results*").  Specifically, Essar alleges that in calculating the net countervailable subsidy rate for the period of review, the U.S. Department of Commerce (the "Department" or "Commerce") erred by: (1) using incorrect benchmarks when determining the adequacy of remuneration received by the government-owned National Mineral Development Corporation ("NMDC") for Essar's purchases of iron ore lumps and fines;[1] (2) improperly finding that the 2005 Special Economic Zone Act ("2005 SEZ Act") administered by the Government of India constituted a countervailable subsidy received during the period of review; (3) resorting to adverse facts available ("AFA") when calculating the benefit conferred to Essar under the Export Promotion Capital Goods Scheme ("EPCGS"), the Captive Port Facilities Program of the State Government of Gujarat ("Gujarat Captive Port Facilities Program"), and the Industrial Policy of the Government of Chhattisgarh ("Chhattisgarh Industrial Policy"); and (4) applying uncorroborated and punitive AFA rates in its benefit calculation under the Chhattisgarh Industrial Policy.  Essar Br. 6-7.  For the reasons explained below, the court affirms the Department's findings on the first three issues and remands the fourth issue to the agency for further proceedings.

---

[1] The Government of India holds 98% of NMDC's shares, thereby making NMDC a government authority. *Issues and Decision Memorandum: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, C-533-821 (Dep't Commerce Apr. 29, 2009), Pub. Doc. 105 at 46.  Essar does not dispute that fact in this case.

## I.  Background

On January 28, 2008, the Department initiated an administrative review of the countervailing duty order on certain hot-rolled carbon steel flat products from India for the period of review spanning January 1, 2007 to December 31, 2007.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 73 Fed. Reg. 4829, 4830 (Dep't Commerce Jan. 28, 2008).  The Department subsequently issued initial questionnaires to Essar and to the Government of India, requesting information regarding possible subsidies provided to Essar during the period of review.  J.A.149-304.  Essar responded to the initial questionnaire on May 12, 2008 and continued to respond to all supplemental questionnaires through November 2008.  J.A. 317-546, 557-766, 774-800, 938-1020, 1027-1284, 1293-1323.  Following several extensions, the Government of India also responded to the initial and supplemental questionnaires, but ultimately failed to provide usable information regarding several subsidy programs, including the 2005 SEZ Act, Chhattisgarh's Industrial Policy, and Gujarat's Captive Port Facilities Program.  J.A. 305-16.

Commerce published the preliminary results of its administrative review on December 30, 2008, finding a net countervailable subsidy rate of 21.95% *ad valorem*.  *Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review*, 73 Fed. Reg. 79,791, 79,802 (Dep't Commerce Dec. 30, 2008).  Commerce found that during the period of review Essar benefitted from the NMDC's provision of iron ore lumps and fines at less than adequate remuneration, from subsidies received

under the 2005 SEZ Act, and from the EPCGS.  *Id.* at 79,797-98.  Commerce also found that, among other subsidy programs, Essar did not benefit during the period of review from Chattisgarh's Industrial Policy or from Gujarat's Captive Port Facilities Program.  *Id.* at 79,801.

Following a notice and comment period, Commerce published the final results of its administrative review, wherein it calculated a net countervailable subsidy rate of 76.88% *ad valorem*.  *Final Results*, 74 Fed. Reg. at 20,924.  The increased subsidy rate reflected calculation changes made between the preliminary and final results, as well as the addition of previously unaccounted for countervailable benefits that Commerce found Essar received under Chhattisgarh's Industrial Policy and Gujarat's Captive Port Facilities Program.  *See generally Issues and Decision Memorandum: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, C-533-821 (Dep't Commerce Apr. 29, 2009), Pub. Doc. 105 ("*Issues and Decision Memorandum*").

In measuring the adequacy of the remuneration received by NMDC, Commerce applied the three-tiered benchmark hierarchy set forth in its regulations and determined that Essar received a countervailable benefit of 16.14% *ad valorem* from NMDC's sales of iron ore lumps and fines.  *Id.* at 16; *see* 19 C.F.R. § 351.511(a)(2)(i)-(iii).[2]  With respect to Essar's purchases of

_____

[2] The regulation provides, in pertinent part:

> (i) In general.  The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question.  Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions.  In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.

iron ore lumps, Commerce compared the NMDC price to a market-determined price that Essar

paid when purchasing the same product from a Brazilian supplier during the period of review.

*Id.* at 15.  In accordance with § 351.11(a)(2)(iv), Commerce adjusted the benchmark to reflect the

ocean and inland freight, import duties, and other import fees payable that would apply if Essar

imported the product.  *Id.* at 15-16.  With respect to Essar's purchases of iron ore fines,

Commerce did not find any appropriate actual home market transactions.  *Id.* at 15.  Therefore, it

resorted to the second benchmark and compared the NMDC to an adjusted world market price

inclusive of ocean freight, import duties, and other import fees payable.  *Id.* at 15-16.  For

purposes of the review, Commerce set the world market price at the 2007 fines price of iron ore

from Hamersley, Australia, as listed in the *Tex Report*.[3]  *Id.* at 15.

---

> (ii) Actual market-determined price unavailable.  If there is no usable
> market-determined price with which to make the comparison under
> paragraph (a)(2)(i) of this section, the Secretary will seek to measure the
> adequacy of remuneration by comparing the government price to a world
> market price where it is reasonable to conclude that such price would be
> available to purchasers in the country in question.  Where there is more
> than one commercially available world market price, the Secretary will
> average such prices to the extent practicable, making due allowance for
> factors affecting comparability.
>
> . . . .
>
> (iv) Use of delivered prices.  In measuring adequate remuneration under
> paragraph (a)(2)(i) or (a)(2)(ii) of this section, the Secretary will adjust the
> comparison price to reflect the price that a firm actually paid or would pay if
> it imported the product.  This adjustment will include delivery charges and
> import duties.

§ 351.511(a)(2)(i)-(iv).

[3] The *Tex Report* is a daily Japanese publication that reports on world-wide price
negotiations for high-grade iron ore. *Issues and Decision Memorandum* at 15.

With regard to the purported subsidies that Essar received under the 2005 SEZ Act,

Commerce found that the Government of India failed to act to the best of its ability in providing

the requested program information and resorted to AFA. *Id.* at 16-17. Accordingly, Commerce

determined that the Government of India provided a financial contribution contingent on export

performance to Essar within the meaning of 19 U.S.C. §§ 1677(5)(D)[4] and 1677(5A)(B).[5] *Issues*

*and Decision Memorandum* at 12. Commerce further found that during the period of review,

Essar benefitted from the subsidy program because the company's Steel-Mod V SEZ unit became

eligible for duty free import of goods and for exemptions from excise duties and the National

Service Tax. *Id.* at 17-19. In calculating the countervailable benefit conferred, the Department

divided Essar's total benefit amounts by Essar's total export sales and arrived at a subsidy rate of

4.3% *ad valorem*. *Id.*

The Department also resorted to partial AFA when evaluating the benefit conferred on

Essar by the EPCGS. *Id.* at 12-14. Under the EPCGS, eligible producers import capital

equipment at a reduced duty provided that they meet an export obligation equal to eight times the

---

[4] Section 1677 defines a financial contribution as:
> (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,
> (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,
> (iii) providing goods or services, other than general infrastructure, or
> (iv) purchasing goods.

§ 1677(5)(D)(i)-(iv).

[5] In order to be countervailable, a subsidy must be specific within the meaning of § 1677(5A). Export subsidies, defined as "a subsidy that is, in law or in fact, contingent upon export performance," satisfy the specificity requirement. § 1677(5A)(B).

duty saved within an eight year period.  *Id.* at 12.  When the producer fails to meet its export obligation, it must repay all or part of the duty reduction.  *Id.*  Commerce found that Essar received two types of benefits from the program.  First, with respect to Essar's outstanding export obligations, Commerce treated the unpaid duties as an interest-free loan and calculated a benefit in the amount of the interest Essar would have paid had it borrowed the amount of the duty reduction at the time of importation.  *Id.* at 12-13.  Second, Commerce treated the import duty savings on fulfilled export obligations as grants received in the year that the Government of India waived the outstanding duty obligation.  *Id.* at 13.

To calculate the amount of both benefits conferred, Commerce requested information from Essar regarding EPCGS licenses for which it had yet to fulfill its export obligations, as well as those for which it already had fulfilled its export obligations.  *Id*. at 7-8.  In Essar's initial questionnaire response, the company provided information about its outstanding obligations, but failed to provide the same information for certain fulfilled licenses.  *Id.*  Commerce sought the missing information in its First and Fourth Supplemental Questionnaires, but determined that Essar did not respond to the best of its ability and applied AFA when calculating the second countervailable benefit.  *Id.* at 8.  The Department then added both benefit calculations together and reached a net countervailable subsidy rate of 1.22% *ad valorem*.  *Id.* at 14.

Commerce also determined that Essar received a countervailable benefit under Gujarat's Captive Port Facilities Program in the form of subsidized wharfage fees.  *Id.* at 21-22.  Because the Government of India did not produce usable information regarding the program, Commerce determined that the Government of India failed to act to the best of its ability and resorted to AFA.  *Id.* at 6-8, 21-22.  On that basis, Commerce found that the port facilities program provided

a specific financial contribution to Essar pursuant to §§ 1677(5)(D)(ii) and 1677(5A). *Id.* at 21.

In determining the benefit conferred by the program during the period of review, Commerce

treated the wharfage fees that Essar paid to the Gujarat Maritime Board as an indirect tax. *Id.* at

22. As such, Commerce calculated the benefit by comparing the cost actually paid by Essar to

record information regarding wharfage fees paid by other firms operating in the area. *Id.*

Ultimately, Commerce arrived at a net subsidy rate of 0.04% *ad valorem. Id.*

Finally, using AFA, Commerce found that Essar benefitted during the period of review

from nine programs administered by the State Government of Chhattisgarh.[6] *Id.* at 6-7. The

Department determined that Essar did not act to the best of its ability in reporting the existence of

an iron ore beneficiation plant in the State of Chhattisgarh, despite having been asked about the

plant in the initial and supplemental questionnaires. *Id.* In selecting the AFA rates, Commerce

reported that it looked to the highest above *de minimis* subsidy rates calculated in prior segments

of the proceeding for programs similar to the nine subprograms included in Chhattisgarh's

Industrial Policy. *Id.* at 22-26. For the four subprograms providing grants, Commerce used a net

subsidy rate calculated for what it described as a similar grant program during the period of

investigation. *Id.* at 23. For the four subprograms providing indirect tax benefits, the

Department used a rate calculated for what it also described as a similar indirect tax program

during the second administrative review. *Id.* For the remaining subprogram involving the

provision of goods for less than adequate remuneration, Commerce used a subsidy rate calculated

---

[6] As discussed *infra*, this finding stands in stark contrast to the Department's recent finding in the 2006 administrative review that "Essar did not use the Chhattisgarh Industrial Policy . . . and therefore did not receive a benefit under this program." *Final Results of Determination Pursuant to Court Remand*, C-533-821 (Dep't Commerce July 15, 2010) at 5 (citation omitted); *accord id.* at 6, 22-23.

for what it described as a similar program from the fourth administrative review.  *Id.*  The

Department set the total net countervailable subsidy rate at 54.68% *ad valorem*.  *Id.* at 24-26.

## II.  Subject Matter Jurisdiction & Standard of Review

Pursuant to 28 U.S.C. § 1581(c), a civil action commenced under 19 U.S.C. § 1516a falls

within the Court's exclusive jurisdiction.  The Court must hold as unlawful any Commerce

determination "unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  § 1516a(b)(1)(B)(i).

Substantial evidence on the record requires "less than a preponderance, but more than a

scintilla."  *Novosteel SA v. United States*, 25 CIT 2, 6, 128 F. Supp. 2d 720, 725 (2001)

(quotation marks & citation omitted), *aff'd*, 284 F.3d 1261 (Fed. Cir. 2002).  To satisfy the

substantial evidence threshold, Commerce must support its conclusions with such relevant

evidence as "a reasonable mind might accept as adequate to support a conclusion" in light of the

entire record, including "whatever fairly detracts from the substantiality of the evidence."

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotation marks &

footnote omitted).  As long as Commerce adequately supports its reasonable conclusion, it is

immaterial if the record lends itself equally to another, inconsistent conclusion.  *See Thai

Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999).

The court conducts a two-step analysis to determine whether Commerce's interpretation

of the countervailing duty statute comports with law.  *Chevron U.S.A., Inc. v. Natural Res. Def.

Council*, 467 U.S. 837, 842-43 (1984).  As an initial step, the court must examine "whether

Congress has directly spoken to the precise question at issue," and "[i]f the intent of Congress is

clear," then the court must give effect to that "unambiguously expressed intent." *Id.* (footnote omitted). When a statute remains "silent or ambiguous with respect to the specific issue," however, the court will look to whether Commerce bases its interpretation on a reasonable construction of the statute in light of the legislature's intent. *See id.* at 843 (footnote omitted); *see also Usinor Sacilor v. United States*, 19 CIT 711, 716, 893 F. Supp. 1112, 1120-21 (1995) (noting that Commerce's interpretation will prevail "[a]s long as the agency's methodology and procedures are [a] reasonable means of effectuating the statutory purpose, and there is substantial evidence on the record supporting the agency's conclusions. . . ." (quotation marks & citation omitted)).

## III. Discussion

### A. The Department's Calculation of the Benefit Conferred to Essar by NMDC's Provision of Iron Ore Lumps and Fines

#### 1. The Statutory Framework for the Calculation of a Subsidy

The countervailing duty regime aims to levy additional duties on certain imports entering the United States in order "to offset the unfair competitive advantages" enjoyed by foreign producers subsidized by their respective governments. *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (footnote omitted). To constitute a countervailable subsidy, a foreign governmental entity must provide a financial contribution to a specific industry, and a respondent must benefit from that contribution. *See* § 1677(5)(A)-(E), (5A). One way by which governments provide subsidies is through the provision of goods and services to a particular industry at less than adequate remuneration. § 1677(5)(D)(iii), (E)(iv).

Commerce measures the adequacy of remuneration by comparing the price paid by a particular respondent to an adjusted benchmark figure representative of the market price for the good at issue. § 1677(5)(E). Commerce arrives at an appropriate benchmark by following a three-tiered hierarchy set forth in its regulations. § 351.511(a)(2)(i)-(iii). The first, and preferred, benchmark relies on a market-determined price "resulting from actual transactions in the country in question," such as "prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions." § 351.511(a)(2)(i). If no such information exists, Commerce resorts to a second benchmark consisting of the world market price for the good "where it is reasonable to conclude that such price would be available to the purchasers in the country in question." § 351.511(a)(2)(ii). Finally, when no data supports the use of either of the first two benchmarks, the Department will look to whether the government price is "consistent with market principles." § 351.511(a)(2)(iii). If the Department utilizes a tier one or tier two benchmark for comparison purposes, it must adjust the selected price "to reflect the price that a firm actually paid or would pay if it imported the product," inclusive of, for example, "delivery charges and import duties." § 351.511(a)(2)(iv). Ultimately, where the chosen market price, adjusted in accordance with Department regulations, differs from the price paid by the respondent by more than a *de minimis* margin, Commerce will find that a countervailable subsidy exists.

**2. The Department's Selection of Benchmark Prices for Iron Ore Lumps and Fines**

In the *Final Results*, Commerce determined that Essar received a countervailable benefit of 16.14% *ad valorem* from NMDC's sales of iron ore lumps and fines. *Issues and Decision*

*Memorandum* at 16.  With respect to Essar's purchases of iron ore lumps, Commerce used as a

tier one benchmark the price that Essar paid to a non-affiliated Brazilian supplier during the

period of review.  *Id.* at 15.  Unable to find a similar tier one benchmark for Essar's purchases of

iron ore fines, Commerce resorted to a tier two benchmark, a world market price based on the

2007 fines prices from Hamersley, Australia.  *Id.*

Essar does not deny that the NMDC provided high-grade iron ore to producers in the

Indian steel industry during the period of review, but takes exception with the Department's

determination that Essar purchased the iron ore lumps and fines for less than adequate

remuneration.  Specifically, Essar avers first that Commerce erred in using the prices that Essar

paid to a Brazilian supplier for iron ore lumps during the period of review as a tier one

benchmark when there existed another, more appropriate market price available.  Essar Br. 21-

22.  Second, Essar maintains that Commerce inexplicably resorted to a second tier benchmark

when measuring the adequacy of remuneration received by NMDC for its provision of iron ore

fines, notwithstanding the existence of a usable tier one benchmark.  Essar Br. 12-18.  Finally,

Essar alleges that the chosen benchmarks for iron ore lumps and fines do not reflect a

comparable price due to physical differences and other dissimilar conditions of sale.  Essar Br.

18-22.  Instead of the benchmarks utilized in the *Final Results*, Essar would have Commerce use

as the benchmark for iron ore lumps and fines the prices reported in the *Tex Report* for NMDC's

iron ore sales to Japanese buyers, which would prove that Essar purchased the iron ore for full

consideration.  Essar Br. 16-18.  Essar contends, in the alternative, that even if Commerce chose

appropriate benchmarks for its less than adequate remuneration analysis, it nonetheless

unreasonably distorted those benchmarks by adding freight costs. Essar Br. 22-24. To remedy this deficiency, Essar requests that the court remand the *Final Results* with instructions to revise the benchmarks to reflect the same delivery terms as Essar's purchases from NMDC. Essar Br. 22.

Commerce supported its selection of benchmarks for both iron ore lumps and fines with substantial evidence. With respect to the lumps benchmark, Commerce acted in accordance with § 351.511(a)(2)(i) when it used the preferred benchmark for its price comparison– "a market-determined price resulting from actual transactions in the country in question." *Issues and Decision Memorandum* at 15. Specifically, Commerce selected prices that Essar itself submitted reflecting purchases of iron ore lumps from an unaffiliated Brazilian company. *Id.* Although Essar finds the prices offered by the NMDC to Japanese buyers more probative than the Brazilian prices, Essar fails to demonstrate how those prices represent "actual sales from competitively run government auctions," a prerequisite to the use of a government price as a tier one benchmark. § 351.511(a)(2)(i). To constitute an actual sale from a competitively run government auction, the Department has stated that the government must sell "a significant portion of the goods . . . through competitive bid procedures that are open to everyone, that protect confidentiality, and that are based solely on price." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998); *see also U.S. Steel Corp. v. United States*, Slip Op. 09-152, 2009 WL 5125921, at *6 (CIT Dec. 30, 2009). Nothing on the record demonstrates that the NMDC prices resulted from such competitive bid procedures. To the contrary, the record suggests that NMDC representatives visited Japan to conduct private negotiations with five Japanese steel producers,

and set the iron ore prices on the basis of those closed negotiations.  J.A. 530.

Similarly, Commerce did not err when it used a world market price from Hamersley, Australia as its benchmark for iron ore fines.  As outlined above, Commerce appropriately determined that the prices Japanese buyers paid to the NMDC for iron ore fines did not reflect a "market determined price" resulting from actual transactions in India.  *Issues and Decision Memorandum* at 50-51.  As there existed no usable first tier benchmarks, Commerce resorted to the next tier in its hierarchy and searched for world market prices on the record.  *Id.*  When using a tier two benchmark, Commerce must average all commercially available world market prices to arrive at the benchmark figure.  § 351.511(a)(2)(ii).  However, because the NMDC prices to Japanese buyers do not constitute market determined prices resulting from government run competitive bidding, Commerce also did not err by excluding the NMDC prices from its benchmark calculation for iron ore fines and by including only the 2007 Hamersley price.  *Id.*; *see also U.S. Steel Corp.*, 2010 WL 5125921, at *7.

Finally, the Department did not act contrary to law when it regarded Brazilian iron ore lumps and Australian iron ore fines as comparable to those sold by the NMDC.  *See* § 351.511(a)(2)(i)-(ii) (requiring that Commerce consider comparability when selecting appropriate benchmarks).  With respect to the benchmark for iron ore fines, Essar maintains that because the Hamersley fines are of blast furnace lump grade ("BF grade"), a type that Essar does not use when manufacturing subject merchandise, it is inappropriate to compare the two prices. Essar Br. 18-19.  Essar confounds what may be incompatible with what is so dissimilar that it cannot serve as a fair price comparison.  The regulation requires product comparability, but does

not mandate that the products be identical.  § 351.511(a)(2)(ii).  In its calculations, the

Department considered differences in iron content between the Hamersley and NMDC iron ore

fines, and adjusted the benchmark price accordingly to reconcile those differences.  *Issues and*

*Decision Memorandum* at 53-54.  With regard to Essar's assertions about the incompatibility of

BF grade fines with Essar's production process, Commerce found that the differences, if they

existed at all, were not so profound as to render the two products incomparable.  *Id.* at 54.  As an

initial matter, the Department explained that Essar failed to provide any evidence that the

Hamersley fines are actually BF grade.  *Id.* ("[W]e find there is no information in the *Tex Report*

to substantiate Essar's claim that the fines from Hamersley are strictly BF-grade lump.").  Even if

Essar succeeded in demonstrating that Hamersley fine prices represent only prices for BF grade

fines, the company still provided no explanation as to why the BF grade is so dissimilar that it

cannot be fairly compared to the fines provided by the NMDC.  To the contrary, record evidence

suggests that Essar potentially used BF grade material when manufacturing subject merchandise

during the period of review.  J.A. 969-70.

Essar also argues that the benchmark iron ore lumps and fines are not comparable to those

sold by NMDC because, in addition to the physical differences, the conditions of sale differ

greatly.  Essar Br. 19-21.  Specifically, Essar maintains that because its iron ore contract with the

NMDC is quoted on an ex-mines basis, and because the Hamersley price reflects free on board

load port (Australia) prices, a comparison of the two yields a distorted picture of the overall price

differential. Essar Br. 19-21. The court finds this argument unavailing because both the relevant

statute and Commerce's regulations require that the agency adjust the benchmark prices to

include freight and import charges. § 1677(5)(E); § 351.511(a)(2)(iv).

Given that Commerce uses delivered prices when measuring the adequacy of

remuneration, Essar's remaining argument that Commerce unreasonably distorted its benchmarks

by adding freight costs is similarly without merit. Pursuant to § 351.11(a)(2)(iv), Commerce

must adjust its first and second tier benchmarks to "reflect the price that a firm actually paid or

would pay if it imported the product." The importation of products necessarily entails payment

of certain "delivery charges and import duties" that would not apply when procured domestically.

*See id.* Following its regulations, Commerce adjusted its benchmarks accordingly by adding

certain freight charges, import duties, and other import fees payable to its lumps and fines

benchmarks. *Issues and Decision Memorandum* at 15-16.[7]

In sum, Commerce supported its selection of benchmark prices for iron ore lumps and

fines with substantial evidence. Moreover, Commerce did not err by refusing to adjust those

---

[7] Essar acknowledges that the Department's regulations call for the use of delivered prices, but nonetheless asks that the court decline to uphold the agency determination below because it resulted in an absurd outcome. Essar Br. 23-24. As support for this proposition, Essar cites *Viraj Group, Ltd. v. United States*, 25 CIT 1017, 1022, 162 F. Supp. 2d 656, 662 (2001) ("Mere compliance with regulations cannot trump what appears to be an absurd result."), *rev'd*, 343 F.3d 1371 (Fed. Cir. 2003)). However, Essar fails to mention that the Federal Circuit reversed that case on the very issue for which Essar cites it. *Viraj Group, Ltd.*, 343 F.3d at 1377 (noting that it "disagree[d] with the Court of International Trade's view that concern over the accuracy of the dumping margin determination compels Commerce to ignore" a statutory mandate). Instead, the court expressly noted that "accuracy concerns cannot trump a specific statutory provision." *Id.* at 1378 (citation omitted).

prices to place them on the same delivery terms as Essar's domestic purchases of iron ore lumps and fines from the NMDC.

**B.  Commerce's Determination That Essar Benefitted During the Period of Review from the 2005 Special Economic Zone Act**

Commerce also appropriately found that Essar benefitted from the 2005 SEZ Act during the period of review.  The SEZ Act, administered by the Government of India, "provides for the establishment, development and management of SEZs for the promotion of exports."  *Id.* at 16. The Department repeatedly requested information on the program from the Government of India, but the requests went largely unanswered.  *Id.* at 16-17.  As a result, Commerce determined that the Government of India did not act to the best of its ability in complying with the agency's requests in the administrative review.  *Id.* at 17.[8]  Consistent with Department practice, the agency found as AFA that participation in the SEZ program was specific within the meaning of § 1677(5A)(B) because it hinged on export performance and that it provided a financial contribution as defined by § 1677(5)(D).  *Issues and Decision Memorandum* at 16.  Record evidence demonstrates that Essar's SEZ unit became eligible for certain duty exemptions during the period of review, and Commerce consequently determined that Essar benefitted from the programs administered under the 2005 SEZ Act.  *Id.* at 17.

Essar concedes that its plant became eligible as of January 31, 2007 for SEZ benefits, but maintains that it produced and exported all relevant subject merchandise that entered the United States during the period of review prior to that date.  Essar Br. 25.  Essar also notes that agency

---

[8] When Commerce makes such a finding, it may employ an inference "adverse to the interests" of the non-cooperative respondent in choosing among the facts otherwise available to fill a record deficiency caused by that party's failure to provide necessary information.  19 U.S.C. § 1677e(b).

regulation requires that if a foreign government ties receipt of a subsidy to a particular product, the subsidy will be attributed only to that product. Essar Br. 25 (citing 19 C.F.R. § 351.525(b)(5)). Therefore, Essar argues that it did not receive a countervailable subsidy for its production of hot-rolled steel during the period of review because the subsidies it received under the 2005 SEZ Act are only attributable to exports after January 31, 2007. Essar Br. 25.

As an initial matter, Essar mischaracterizes how Commerce attributes subsidies under § 351.525. Although Essar produced and exported all relevant subject merchandise before it became eligible for benefits under the 2005 SEZ Act, it also reported receiving certain SEZ benefits during the period of review. *Issues and Decision Memorandum* at 17-19; *see also* J.A. 1295-1312. Further, despite Essar's assertions to the contrary, nothing on the record suggests that Essar's receipt of those benefits was contingent on the shipment of specific exports. *Issues and Decision Memorandum* at 39. Commerce will attribute an export subsidy to all "products exported by a firm" unless the record shows that the respondent government tied receipt of that subsidy to a particular product. § 351.525(b)(5)(i). Consequently, Commerce did not err when it attributed the benefits that Essar reported under the 2005 SEZ Act to the company's total exports during the period of review. It is of no import that Essar's exports of subject merchandise never actually benefitted from the SEZ subsidies because, as this court previously noted, "[a]s long as the subject merchandise could be produced, it is immaterial whether and how such subject merchandise is actually produced." *MTZ Polyfilms, Ltd. v. United States*, 33 CIT __, __, 659 F. Supp. 2d 1303, 1314 (2009).

Essar's remaining argument that it does not produce any subject merchandise in the SEZ area, so that merchandise could not benefit from the subsidies provided under the 2005 SEZ Act,

also is without merit. Essar Br. 25. First, Essar failed to exhaust administrative remedies with

regard to this claim. Congress requires that litigants exhaust administrative remedies "where

appropriate," 28 U.S.C. § 2637(d), in part so that the Court does not usurp the subject agency's

powers by setting aside a "determination upon a ground not theretofore presented and deprive[]

the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its

action." *Unemployment Comp. Comm'n of Territory of Alaska v. Aragon*, 329 U.S. 143, 155

(1946) (footnote omitted). Exhaustion is almost always appropriate in the countervailing duty

context "because it allows the agency to apply its expertise, rectify administrative mistakes, and

compile a record adequate for judicial review." *Carpenter Tech. Corp. v. United States*, 30 CIT

1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006). Moreover, even if Essar had advanced the

argument at the agency level, record evidence demonstrates that the subject merchandise did

benefit from the SEZ subsidies. Specifically, Essar manufactured Hot Briquetted Iron/Direct

Reduced Iron, an input used in the production of subject merchandise, in the SEZ facilities at

issue during the period of review. J.A. 328, 332-34. Therefore, Commerce did not err in finding

that the 2005 SEZ Act constituted a countervailing subsidy received during the period of review.

**C. The Department's Decision to Resort to AFA When Calculating the Countervailable
Benefit Received Pursuant to Certain Government Programs**

    **1. Statutory Framework for Determinations on the Basis of AFA**

When conducting a countervailing duty administrative review, Commerce seeks program

information from the foreign government allegedly subsidizing the production of the subject

merchandise and from the respondent companies purportedly benefitting from those subsidies. If

the Department finds the information provided in response to its questionnaires deficient, it shall

"promptly inform the person submitting the response of the nature of the deficiency and shall, to

the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion" of the review. 19 U.S.C. § 1677m(d). At that point, the respondent company or foreign government may choose to remedy the deficiency, but if it fails to do so within a reasonable time, Commerce must resort to facts otherwise available on the record to make its determination. § 1677e(a). Moreover, if Commerce also finds that a respondent did not act "to the best of its ability to comply" with the Department's requests, it may "use an inference that is adverse" to the interests of the parties in choosing among those facts otherwise available. § 1677e(b).

Typically, foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients. The respondent companies, on the other hand, will have information pertaining to the existence and amount of the benefit conferred on them by the program. Because the Department seeks different information from each respondent, the Department's AFA analysis varies depending on which party has provided a deficient response. Where the foreign government fails to act to the best of its ability, Commerce will usually find that the government has provided a financial contribution to a specific industry. *Issues and Decision Memorandum* at 4-5 (citing *Notice of Preliminary Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 71 Fed. Reg. 11,397, 11,399 (Dep't Commerce Mar. 7, 2006)). Under that scenario, the agency then attempts to use information provided by the individual respondent companies regarding the benefit, if any, conferred by the particular program. *See id.* at 5. If the companies similarly fail to act to the best of their ability in complying with Commerce's requests, Commerce will find that the noncompliant companies

both used and benefitted from the subsidy program during the period of review. *See, e.g.*, *id.* at 7. To arrive at an appropriate rate, the Department may rely on secondary information derived from the petition, the original investigation, or from other administrative reviews. § 1677e(b). However, when Commerce uses such secondary information, it must "to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal." § 1677e(c).

In *Nippon Steel Corp. v. United States*, the Federal Circuit provided the following guidelines for the judicial review of an agency's decision to resort to AFA:

> To conclude that an importer has not cooperated to the best of its ability and to draw an adverse inference under section 1677e(b), Commerce need only make two showings. First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation . . . .

337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (citation omitted).

## 2. Export Promotion Capital Goods Scheme

The EPCGS provides permanent customs duty reductions to eligible producers who meet a corresponding export obligation within an allotted time period. *Issues and Decision Memorandum* at 12. Commerce determined that Essar received two types of benefits from the program, in the form of interest free loans and grants. *Id.* at 12-14. In calculating the benefit conferred on Essar by the grants, Commerce sought information from Essar regarding those EPCGS for which Essar had fulfilled its export obligations during the period of review. *Id.* at 13. Despite providing Essar with three opportunities to furnish the necessary information, Essar

failed to do so. *Id.* at 7-8. Accordingly, Commerce found that Essar did not act to the best of its ability in cooperating with its requests and resorted to partial AFA to complete the record. *Id.* at 8.

Essar contends that the Department erred by applying partial AFA to Essar's benefit calculation under the EPCGS. Essar Br. 25-26. Specifically, Essar maintains that the Department never informed it of the exact nature of its record deficiency and, as a result, Essar did not receive its statutorily mandated opportunity to remedy that deficiency. Essar Br. 25-26. Second, Essar notes that even if Commerce sought the requested information, resort to AFA was inappropriate because the missing information would not have figured into the benefit calculation. Essar Reply Br. 15. For reasons stated below, both of these arguments fail.

Essar correctly asserts that Commerce must ensure that respondents are "fully aware of what information the Department [seeks] and the form in which it [seeks] the data," and that failure to do so "can render the decision 'unsupported by substantial evidence and otherwise contrary to law.'" *SKF USA Inc. v. United States*, 29 CIT 969, 978, 391 F. Supp. 2d 1327, 1335-36 (2005) (quoting *Usinor Sacilor v. United States*, 19 CIT 711, 745, 893 F. Supp. 1112, 1141-42 (1995), *aff'd in part and rev'd in part*, 215 F.3d 1350 (Fed. Cir. 1999)). Essar is also correct that respondents have the right to remedy a record deficiency. § 1677m(d). However, it wrongly claims that Commerce failed to satisfy those statutory obligations in this case.

Commerce provided Essar with three separate opportunities to supply information regarding its usage of the EPCGS. In its initial questionnaire, Commerce requested information pertaining to "EPCGS duty exemptions received during the [period of review] and the preceding 14 years for which [Essar] has fulfilled its export obligations." J.A. 238. Essar failed to supply

this documentation. J.A. 319-23, 940-44, 952-59. The Department sought the same information again in a supplemental questionnaire, but Essar withheld documentation for certain licenses because, for those licenses, "there were no imports and all goods would be procured from suppliers within India." J.A. 560, 1030. Commerce tried a third time to obtain the outstanding information, even specifying the license numbers for which it lacked the requisite information and offering Essar the opportunity to explain how it used an EPCGS duty license to procure a duty-free domestic good. J.A. 772, 1290. In response to that request, it appears that Essar provided limited information for only one of the requested licenses. J.A. 797-98, 1317-18. In light of this background, a "reasonable and responsible importer would have known" what information Commerce sought, and the refusal to provide that information is attributable only to Essar's "failing to put forth its maximum efforts to . . . obtain the requested information from its records." *Nippon Steel Corp*., 337 F.3d at 1382-83. Therefore, the Department properly resorted to AFA to fill the gaps in the administrative record caused by Essar's failure to act to the best of its ability.

Essar also mistakenly contends that it appropriately withheld the requested documentation because the remaining EPCGS licenses reflected domestic purchases that could not benefit from the import duty exemption. Essar Reply Br. 15. With this argument, Essar ignores that Commerce, and not Essar, is charged with conducting administrative reviews and weighing all evidence in its calculation of a countervailing duty margin. *See Ansaldo Componenti, S.p.A. v. United States*, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986) ("It is Commerce, not the respondent, that determines what information is to be provided for an administrative review."); *see also* 19 U.S.C. § 1675(a)(1)(A). Regardless of whether Essar

deemed the license information relevant, it nonetheless should have produced it the event that Commerce reached a different conclusion. Moreover, Commerce even provided Essar with the opportunity to explain why the information was not relevant to the benefit calculation, and Essar declined to offer such an explanation. J.A. 772, 1290. Given that Essar failed to place anything on the record demonstrating unequivocally that it did not benefit from the subject licenses, Commerce did not err by applying AFA and assuming a benefit for the outstanding licenses. *See Wash. Int'l Ins. Co. v. United States*, Slip Op. 09-78, 2009 WL 2460824, at *5 (CIT July 29, 2009) ("[W]hen the evidence surrounding an interested party's claim is inconclusive, Commerce may find that the party has not met its burden of proof and resort to facts available.").

### 3. The Gujarat Captive Port Facilities Program

Commerce also found, on the basis of partial AFA, that Essar benefitted during the period of review from subsidized wharfage fees provided under Gujarat's Captive Port Facilities Program. *Issues and Decision Memorandum* at 21-22. In reviewing the countervailability of that program, Commerce sought information from the Government of India regarding the program's administration and participants. *Id.* at 5; J.A. 192-93. The Government of India failed to supply the requested information, so Commerce found as AFA that the program provided a specific financial contribution under § 1677(5)(D) and § 1677(5A), respectively. *Issues and Decision Memorandum* at 5. Specifically, Commerce treated the subsidized wharfage fees offered under Gujarat's Captive Port Facilities Program as an indirect tax benefit. *Id.* at 22. In evaluating whether Essar received such a benefit during the period of review, Commerce looked to the difference between the wharfage fees that Essar paid under the Captive Port Facilities Program and what it would have paid absent the program. *Id.* (citing 19 C.F.R. § 351.510(a)(1) ("[A]

benefit exists to the extent that the taxes or import charges paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program.")).

Essar incorrectly believes that Commerce unlawfully resorted to AFA against Essar when calculating its benefit under Gujarat's program. Essar Br. 33-39. Commerce applied AFA against only the Government of India, with the result that Commerce found that the EPCGS provided a financial contribution to a specific industry. *Issues and Decision Memorandum* at 21. With respect to the benefit received, on the other hand, Commerce had no government-provided information on the program, such as wharfage fee rates charged to program participants and to non-participants. It, therefore, resorted to facts otherwise available on the record to derive the necessary information. *Id.* at 21-22. The record, as provided by Essar, shows that while Essar paid sixty rupees per metric ton in wharfage fees, other companies operating on Gujarat's jetties paid seventy rupees per metric ton during the period of review. *Id.*; *see also* J.A. 1236, 1276. In view of this record evidence, Commerce did not err by calculating a benefit for Essar in the amount of a ten rupees per metric ton discount on wharfage fees.

Essar also takes exception to Commerce's apparent rejection of record information demonstrating that Essar paid undiscounted wharfage fees in connection with the operation of its captive jetty in the State of Gujarat. Essar Reply Br. 15. Essar did provide documentation from 2000 suggesting that, at some point, it may have paid full wharfage fees to the State of Gujarat. J.A. 1034-36, 1213-15. However, Essar also supplied documentation from 2003 indicating that it received a ten rupees per metric ton discount on wharfage fees. J.A. 1236, 1276. Commerce evidently found that the more recent documentation provided a more accurate account of the actual wharfage fees that Essar and others paid during the period of review. The court will

uphold a determination supported with substantial evidence even if two inconsistent conclusions may be drawn from evidence on the record.  *See Thai Pineapple Pub. Co.*, 187 F.3d at 1365. Since the court finds that Commerce adequately supported its benefit calculation, Commerce did not err in assessing a 0.04% countervailable subsidy rate against Essar under Gujarat's Captive Port Facilities Program.

### 4.  Chhattisgarh Industrial Policy

Commerce also employed AFA when examining the benefit supposedly conferred on Essar by the nine subprograms composing Chhattisgarh's Industrial Policy.  As with other subsidy programs, Commerce found as AFA that Chhattisgarh's Industrial Policy provided a specific financial contribution to Essar during the period of review.  *Issues and Decision Memorandum* at 22.  Commerce additionally determined that Essar failed to respond to the best of its ability to the Department's program questions and found as AFA that Essar used and benefitted from the nine subprograms during the period of review.  *Id.* at 6-7.  These findings ultimately led Commerce to set the total net countervailable subsidy rate for the Chhattisgarh Industrial Policy programs at 54.68% *ad valorem*.  *Id.* at 24-26.

However, Commerce's determination in the sixth administrative review that Essar did not benefit from the Chhattisgarh Industrial Policy, and the Department's concurring admissions during oral argument, cast grave doubt upon the present findings.  *See Final Results of Redetermination Pursuant to Court Remand*, C-533-821 (Dep't Commerce July 15, 2010) ("*Sixth Administrative Review Redetermination*") at 5-6, 22-23; Oral Argument at 8:11-13:00; *see also* Letter from J. Barzilay to Parties (July 20, 2010) (on file with Court).  Specifically, Commerce found that evidence on the record, a letter provided by the State Government of

Chhattisgarh, "indicates that the [State Government of Chhattisgarh] made a determination that Essar's beneficiation plant is not eligible for the *2004-2009* [Chhattisgarh Industrial Policy] program." *Sixth Administrative Review Determination* at 22 (emphasis added); *see id.* at 23 (citing Admin. R. Confidential Doc. 1129 Ex. 4). Moreover, Commerce found that this evidence "*covering the 2004-2009 period*" rendered moot Defendant-Intervenor's claim in that review that Essar's eligibility may change over time. *Id.* at 23 (citing Admin. R. Confidential Doc. 1993 Ex. 9) (emphasis added). These conclusions strongly impugn, if not outright refute, the Department's determination that Essar benefitted from the Chhattisgarh Industrial Policy during the present period of review.

Although Commerce argues that it now need not consider this evidence because it arose in a different administrative review, *see* Def.'s Resp. to Court Order1-2, Aug. 9, 2010 (citing *Home Prods. Int'l, Inc. v. United States*, 33 CIT __, __, 675 F. Supp. 2d 1192, 1199 (2009)), in this specific circumstance the court disagrees. The Federal Circuit has held that "deference is not owed to a determination that is based on data that the agency [knows to be] incorrect. The law does not require, nor would it make sense to require, reliance on data which might lead to an erroneous result." *Borlem S.A.-Impreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990); *accord Anshan Iron & Steel Co. v. United States*, 28 CIT 1728, 1737, 358 F. Supp. 2d 1236, 1243 (2004); *see also Win-Tex Prods., Inc. v. United States*, 17 CIT 786, 789, 829 F. Supp. 1349, 1352 (1993) ("[I]ndisputable facts like the agency's own prior determinations may be judicially noticed by the court . . . ."). Commerce previously recognized the validity of evidence supplied by the State Government of Chhattisgarh that Essar is not eligible to participate in the Chhattisgarh Industrial Program from 2004 to 2009. *Sixth Administrative*

*Review Determination* at 23.  It may not now ignore this evidence and claim that Essar benefitted

from the program in 2007.  *See Anshan Iron & Steel Co.*, 28 CIT at 1734 & n.3, 358 F. Supp. 2d

at 1241 & n.3; *see also id.* at 1736, 358 F. Supp. 2d at 1243 ("Evidence cannot be substantial if

Commerce is aware that the conclusion it supports is false.") (citation omitted).

When the court cannot arrive at "'the correct decision on the basis of the evidence in any

civil action," it may order "such further administrative or adjudicative procedures as [it]

considers necessary.'"  *Borlem S.A.-Impreedimentos Industriais*, 913 F.3d at 937 n.4 (quoting 28

U.S.C. § 2643(b)); *see also Anshan Iron & Steel Co.*, 28 CIT at 1737, 358 F. Supp. 2d at 1243

(ordering Commerce to reopen administrative record and consider financial statement from prior

review to remedy incorrect, contradictory determination currently before court).  The court

therefore orders Commerce to reopen and enter Essar's Feb. Remand QR Ex. 4 and Essar's Apr.

14 QR Ex. 9 into the administrative record so that on remand the agency may fully consider their

bearings on Essar's participation in the Chhattisgarh Industrial Program.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff Essar's Motion for Judgment Upon the Agency Record is

**GRANTED** in part and **DENIED** in part, and that this case is **REMANDED** to Commerce for

further proceedings.  Specifically, it is hereby

**ORDERED** that the Department's calculation of the benchmark prices for iron ore lumps

and fines used in its less than adequate remuneration analysis for Essar's purchases from the

NMDC is **AFFIRMED**; it is further

**ORDERED** that Commerce's finding that the 2005 SEZ Act constituted a countervailing subsidy from which Essar benefitted during the period of review is **AFFIRMED**; it is further

**ORDERED** that the Department's decision to apply AFA to Essar with respect to the EPCGS is **AFFIRMED**; it is further

**ORDERED** that the Department's decision to apply neutral facts available to Essar with respect to Gujarat's Maritime Policy is **AFFIRMED**; it is further

**ORDERED** that the Department reopen the administrative record and admit Admin. R. Confidential Docs. 1129 Ex. 4 and 1193 Ex. 9, and consider these documents in its reassessment of whether Essar benefitted from Chhattisgarh's Industrial Policy; and it is further

**ORDERED** that Commerce shall file its remand results no later than October 14, 2010, and that the parties shall file any responses to the remand results by November 4, 2010.


Dated:    August 19, 2010                          /s/ Judith M. Barzilay
             New York, New York                        Judith M. Barzilay, Judge