# United States Court of Appeals
# for the Federal Circuit

---

**ESSAR STEEL LIMITED,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Cross Appellant,*

**and**

**UNITED STATES STEEL CORPORATION,**
*Defendant-Cross Appellant.*

---

2011-1270, -1271, -1289

---

Appeals from the United States Court of International Trade in case no. 09-CV-0197, Judge Judith M. Barzilay.

---

Decided: April 27, 2012

---

MARK P. LUNN, Arent Fox LLP, of Washington, DC, argued for plaintiff-appellant.

DAVID D'ALESSANDRIS, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were TONY WEST, Assis-

tant Attorney General, JEANNE E. DAVIDSON, Director, PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was DEBORAH R. KING, Attorney-International, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

NATHANIEL B. BOLIN, Skadden, Arps, Slate, Meagher & Flom, LLP, of Washington, DC, argued for the defendant-cross appellant United States Steel Corporation. With him on the brief were ROBERT E. LIGHTHIZER, JEFFREY D. GERRISH and STEPHEN J. NARKIN. Of counsel was JAMES C. HECHT.

---

Before NEWMAN, LOURIE, and MOORE, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* MOORE. *Circuit Judge* NEWMAN dissents in part, concurs in the result.

MOORE, *Circuit Judge*.

Essar Steel Limited (Essar) appeals from the United States Court of International Trade's decision affirming the Department of Commerce's (Commerce) finding that Essar received countervailable subsidies from the government of India for certain hot-rolled carbon steel flat products. The United States government and United States Steel Corporation (US Steel) cross-appeal the trial court's decision affirming Commerce's finding that Essar received no subsidies through the Chhattisgarh Industrial Program (CIP). For the reasons described below, we affirm the trial court's decision to uphold the subsidies found by Commerce and reverse its decision regarding the CIP.

BACKGROUND

In 2008, Commerce initiated an investigation to assess whether Essar received countervailable subsidies for its iron ore products in India for the period of review from January 1, 2007 through December 31, 2007. *See Initiation of Anti-dumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 73 Fed. Reg. 4829 (Jan. 28, 2008). Commerce investigated several programs, including Essar's purchase of iron ore from the government-owned National Mineral Development Corporation (NMDC), participation in programs under India's Special Economic Zone (SEZ) Act, and participation in the CIP administered by the state government of Chhattisgarh, India.

Commerce concluded that Essar's purchase of iron ore from NMDC was countervailable. To compare pricing of iron ore purchases, Commerce sought benchmark purchases of both iron ore lumps and fines, which are two different types of iron ore products. Commerce relied on Essar's previous purchase of iron ore lumps from a non-affiliated Brazilian supplier during the period of review. Commerce found no comparable Essar purchase of iron ore fines, so it used the price from Hamersley, Australia listed in the *Tex Report*, which is a daily Japanese publication reporting on international price negotiations for high-grade iron ore. In addition, Commerce included freight and delivery charges in its benchmark pricing.

With respect to the SEZ Act, Commerce found that the government of India did not cooperate to the best of its ability in responding to Commerce's questions. As a result, Commerce applied adverse facts available and determined that Essar's use of programs under the SEZ Act constituted subsidies.

Commerce also questioned Essar regarding its participation in the CIP. In May 2008, Essar stated that it did not

have any manufacturing facilities in the State of Chhattisgarh. Commerce then identified a press release indicating that Essar did, in fact, have an iron ore manufacturing plant in Chhattisgarh, so Commerce submitted the question to Essar a second time. In response to the second question, in October 2008, Essar stated that it did not have an iron ore beneficiation plant in Chhattisgarh. A beneficiation plant differs from a manufacturing plant, but both are involved in the processing of iron ore. Essar claimed that the Chhattisgarh facilities were still in the planning stage. Accordingly, in its preliminary results that same month, Commerce found that Essar had no facilities in Chhattisgarh and therefore *did not* benefit from the CIP.

Before Commerce initiated its investigation for the 2007 period of review and before Essar's denials regarding the existence of *any* plant (manufacturing or beneficiation), Essar applied to the government of Chhattisgarh for benefits under the CIP because of its facility in Chhattisgarh. Essar sent a request to the government of Chhattisgarh on March 26, 2007. Essar received word from the government of Chhattisgarh on September 12, 2008—while the instant investigation was still underway—that its application for benefits under CIP was denied. Essar did not submit either its request for benefits or the denial of these benefits to Commerce in response to Commerce's questionnaires.

Along with its answers to Commerce's questions during the investigation for the 2007 period of review, Essar submitted to Commerce a 2006–2007 annual report, which lists an Essar facility in Chhattisgarh. Hence the only evidence of record at that time was an annual report and press release which both indicated the presence of a facility in Chhattisgarh and two separate denials by Essar of any facilities in Chhattisgarh. Finally, in its February 2009 rebuttal brief to Commerce during Commerce's review of its

initial results, Essar argued for the first time that its facility in Chhattisgarh was ineligible for benefits under the CIP. It did not submit any evidence in support of this claim. Commerce noted Essar's failure to respond to the best of its ability to Commerce's questions by providing false information about its Chhattisgarh facility. Because of Essar's failure to respond to the best of its abilities, Commerce applied adverse facts in its May 2009 final results and concluded that Essar did benefit from the CIP.

Essar appealed Commerce's final results to the Court of International Trade. The court upheld Commerce's decision to impose duties for Essar's purchase of iron ore from NMDC and its participation in the SEZ Act. *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1295–96 (Ct. Int'l Trade 2010). The trial court held that Commerce applied appropriate benchmark pricing for its evaluation of Essar's iron ore purchases from NMDC and correctly included freight and delivery charges. *Id.* at 1295. It further upheld Commerce's results with respect to the SEZ Act. *Id.* at 1296. Essar argued for the first time at the trial court that it did not produce merchandise within the Special Economic Zone, but the court held that Essar failed to exhaust administrative remedies with respect to that argument. *Id.*

The trial court remanded the case to Commerce for further proceedings regarding the CIP. The court relied on the September 12, 2008 letter in which the government of Chhattisgarh stated that Essar's Chhattisgarh facility was not eligible for benefits under the CIP. The court knew of the letter because Essar had submitted it during Commerce's independent review in a different investigation of Essar's iron ore practices for the 2006 period of review, not the instant investigation. *Id.* at 1300. Although the trial court accepted that Essar did not act to the best of its ability

in responding to Commerce's questions, it directed Commerce to reopen the record to consider the letter on remand.

On remand, Commerce entered two documents into the record: the March 26, 2007 letter from Essar to the government of Chhattisgarh requesting subsidies under the CIP; and the September 12, 2008 letter from the government of Chhattisgarh informing Essar that it did not qualify for benefits under the CIP for 2004 to 2009. Despite having the documents in its custody during Commerce's investigation, Essar did not submit either document to Commerce. Commerce "strongly disagreed" with the trial court's decision to remand and enter the documents into the record, but "under protest" it held that Essar did not receive benefits under the CIP. The Court of International Trade affirmed Commerce's finding post-remand.

Essar appealed Commerce's decision to impose subsidies for its purchase of iron ore from NMDC and its participation in the SEZ Act program. The United States and US Steel cross-appealed the decision regarding the CIP. We have jurisdiction to review the final judgment of the Court of International Trade pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

We review the Court of International Trade's decisions *de novo*, applying anew the same standard of review applied by that court. *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1377 (Fed. Cir. 2008). We uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *NSK Ltd. v. United States*, 510 F.3d 1375, 1379 (Fed. Cir. 2007); 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *U.S. Steel Corp. v.*

*United States*, 621 F.3d 1351, 1357 (Fed. Cir. 2010) (citations omitted).

The countervailing duty laws impose duties on imported goods that are subsidized by the country of export or manufacture. The countervailing duty laws provide that a countervailable subsidy exists when a foreign government provides a specific financial contribution to a party and that party benefits from the contribution. *See* 19 U.S.C. § 1677(5). One way that a party receives a benefit is through the provision of goods or services at "less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv).

## I. Essar's Appeal

### A. NMDC

At the outset, we note that in this appeal Essar presents identical arguments for the NMDC subsidies as in its previous appeal, which was decided after Essar submitted its principal brief in this case. We rejected Essar's arguments in the previous appeal and upheld the trial court's decision to use the Australian and Brazilian benchmarks and add freight and import costs to the benchmarks. *U.S. Steel Corp. v. United States*, 425 Fed. App'x 900 (Fed. Cir. 2011). The previous appeal relates to a separate Commerce investigation of the period of review covering January 1, 2006 through December 31, 2006, so it is not binding on us in this case. We identically conclude that Commerce's decision to apply countervailing duties for the NMDC subsidies is supported by substantial evidence and comports with the regulation. 19 C.F.R. § 351.511.

Essar argues that Commerce erred in choosing benchmark prices for the sale of iron ore lumps and fines. Rather than relying on the sales to Essar by the Brazilian suppliers

and the Australian sales listed in the Tex Report, Essar argues that Commerce should have used sales made by NMDC to Japanese buyers as the proper benchmark.

Commerce must determine the proper benchmark price in order to determine if the goods were sold for "less than adequate remuneration." *See* 19 C.F.R. § 351.511. Commerce's regulations set forth a three-tiered hierarchy to identify the appropriate benchmark. *Id.* First, Commerce looks for a "tier 1" benchmark, an actual transaction price in the country in question, which may, in some cases, include sales by competitively-run government auctions. § 351.511(a)(2)(i). If no such transactions exist, Commerce looks for a "tier 2" benchmark, a world market price for the goods in question. § 351.511(a)(2)(ii). If neither of those is available, Commerce measures the adequacy of the remuneration by assessing whether the price is consistent with market principles. § 351.511(a)(2)(iii).

Essar contends that NMDC's sale to Japanese buyers is an appropriate tier 1 benchmark for both lumps and fines. Although Essar acknowledges that NMDC is controlled by the Indian government, it submitted no evidence that NMDC's sale price to Japanese buyers was determined by a competitively-run government auction. Commerce has stated that a competitively-run government auction must be open to everyone, protect confidentiality, and be based solely on price. *Countervailing Duties*, 63 Fed. Reg. 65348, 65377 (Dep't Commerce Nov. 25, 1998). The record evidence shows that NMDC's sale to Japanese buyers was open only to Indian government officials and five Japanese buyers during a private iron ore dealing mission. Therefore Commerce's conclusion that the NMDC sale price to Japanese buyers is not an appropriate tier 1 benchmark price is supported by substantial evidence.

Commerce appropriately identified Essar's purchase of iron ore lumps from the Brazilian supplier as a tier 1 benchmark for the iron ore lumps Essar purchased from NMDC. For iron ore fines, Commerce had no tier 1 benchmark, so it identified the published price of iron ore fines from Hamersley, Australia as a tier 2 world market price. Though the Australian iron ore is not identical to NMDC's iron ore, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue. We conclude Commerce properly took into account factors affecting comparability in its selection of the benchmark. Commerce's conclusion that the Hamersley, Australia iron ore fines price is an appropriate benchmark is supported by substantial evidence. *See* § 351.511(a)(2)(ii).

Essar further argues that Commerce and the trial court erred by adding freight and import costs to the world market price. Both the statute and the regulation, however, *require* that these costs be added to the benchmark prices. 19 U.S.C. § 1677(5)(E) ("[T]he adequacy of remuneration *shall be determined* in relation to prevailing market conditions . . . includ[ing] price, quality, availability, marketability, transportation, and other conditions of sale." (emphasis added)); 19 C.F.R. § 351.511(a)(2)(iv) (stating that the benchmark price "*will include* delivery charges and import duties" (emphasis added)). Commerce's decision to add these charges to the benchmark prices is consistent with the relevant statute and regulation and is supported by substantial evidence.

### B. SEZ Act

Essar also appeals the trial court's decision to uphold countervailing duties for benefits received under the SEZ Act. Though Essar acknowledges that it was eligible for

subsidies under the SEZ Act at some point and that it did receive SEZ benefits during the period of review, it argues that the subject merchandise was ineligible because it was produced before the date on which Essar's eligibility for SEZ Act benefits took effect. Accordingly, Essar urges that the benefits should be "tied" only to merchandise produced or exported after this date. Because none of its subject merchandise was produced after that date, Essar argues that no countervailing duty should be imposed.

Commerce's regulations state that "[i]f a subsidy is tied to the production or sale of a particular product, the Secretary will attribute the subsidy only to that product." 19 C.F.R. § 351.525(b)(5)(i). However, no evidence exists to support "tying" the benefits under the SEZ Act only to particular products. In the absence of such evidence, Commerce was correct to apply the subsidies to all products exported by Essar. *See* 19 C.F.R. § 351.525(b)(2). That is precisely what Commerce did here.

Finally, Essar argues that Commerce should not have imposed any countervailing duties under the SEZ Act because it does not produce any subject merchandise in the SEZ area and therefore cannot benefit from the SEZ Act. As the trial court correctly held, this argument fails because Essar has not exhausted its administrative remedies. Essar did not raise this argument before Commerce and is thus precluded from raising it for the first time at the Court of International Trade. *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010). We agree that substantial evidence supports Commerce's decision to impose countervailing duties on Essar for benefits received under the SEZ Act.

II. The United States and US Steel's Cross-Appeal

The United States and US Steel (collectively, the cross-appellants) appeal from the trial court's decision affirming the post-remand determination that Essar received no countervailable benefits through the CIP. The cross-appellants argue that the court should have let stand Commerce's previous determination applying adverse facts. Commerce has the power to apply adverse facts when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). The trial court acknowledged that Essar did not act to the best of its ability when responding to Commerce's questions, but nonetheless vacated and remanded Commerce's determination to apply adverse facts. The trial court based its remand on Essar's belated admission—after the imposition of adverse facts—that it had a facility in Chhattisgarh and on the court's own identification of the two letters relating to Essar's facility in Chhattisgarh. The trial court ordered the remand and required Commerce to place the letters on the record and consider them. This exceeded the trial court's authority and was erroneous.

Essar's responses to Commerce's questions in the initial determination demonstrate that it did not act to the best of its ability to comply with requests for information. When asked the first time about facilities in Chhattisgarh, Essar stated that "Essar does not have any manufacturing facilities in the State of Chhattisgarh." J.A. 662. After finding the Press Release about Essar's Chhattisgarh plant, Commerce presented the question a second time, but Essar still withheld the truth about its Chhattisgarh facility:

> Commerce:     On page III-68 of your May QR, you stated that you "do {} not have any manufacturing facilities in the State of Chhattisgarh." An Essar press release on the record of this review appears to indicate that you have an iron ore beneficiation

> plant located in . . . Chhattisgarh. Please state whether you received subsidies under the Chhattisgarh Industrial Policy with respect to an iron ore beneficiation plant in [Chhattisgarh] and any other facility in Chhattisgarh."
>
> Essar: **No. Essar does not have an iron ore beneficiation plant in . . . Chhattisgarh.**

J.A. 1179. Essar repeatedly denied having a plant (manufacturing or beneficiation) in Chhattisgarh. If Essar had no plant in Chhattisgarh, then there would be no question about the CIP subsidies. Both of these denials occurred *after* Essar had applied for these exact same CIP subsidies claiming entitlement because of its Chhattisgarh plant. Hence, Essar was applying for CIP benefits because of its Chhattisgarh facility and then telling Commerce it does not even have a plant in Chhattisgarh. Essar then received a response to its application for subsidies from the government of Chhattisgarh—despite Essar's Chhattisgarh plant, the government of Chhattisgarh determined that it was not entitled to CIP subsidies. After its repeated claims that it did not have a plant in Chhattisgarh, Essar did not submit the letter which indicated that its plant in Chhattisgarh was not entitled to CIP benefits to Commerce.

At the time Commerce determined to apply adverse facts with regard to whether Essar received CIP benefits the only evidence of record was Essar's repeated claims that it had no manufacturing or beneficiation plant in Chhattisgarh and a press release and annual report indicating that Essar did have a plant in Chhattisgarh. Only *after* Essar was denied benefits under the CIP and *after* Commerce had applied adverse facts against Essar did Essar change its story. In light of the record, there can be no doubt Com-

merce's decision to apply adverse facts was supported by substantial evidence.

Essar had custody of both its request for benefits and the government's rejection during Commerce's investigation. Yet Essar withheld these documents and provided contradictory information to Commerce. We have held that "[c]ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Providing false information and failing to produce key documents unequivocally demonstrate that Essar did not put forth its maximum effort. *See id.* at 1383 ("While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element.").

Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one. *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). The purpose of the adverse facts statute is "to provide respondents with an incentive to cooperate" with Commerce's investigation, not to impose punitive damages. *F. LLi De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). An appropriate decision based on adverse facts is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *Id.* at 1032. A decision based on adverse facts is not punitive when determined in accordance with the statutory requirements, as Commerce did here. *KYD, Inc. v. United States*, 607 F.3d 760, 767–68 (Fed. Cir. 2010).

The imposition of adverse facts can be inappropriate if it is overly punitive. For example, in *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010), Commerce imposed an unreasonably high antidumping margin, which was "more than ten times higher than the average dumping margin for cooperating respondents." *Id.* at 1324. That rate was "punitive, aberrational, or uncorroborated." *Id.* In this case, however, the countervailing duty imposed for Essar's participation in the CIP was on par with similar subsidy programs and therefore not punitive. Commerce did not err in its application of adverse facts, and no party argues that the application of adverse facts based on the record before the remand was punitive.

Without the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations. Indeed, Essar's actions demonstrate both. Essar withheld information about its Chhattisgarh facility. Only when Essar knew that it would face countervailable subsidies did it finally make concessions about its Chhattisgarh facility. In addition, Essar's failure to cooperate with Commerce's questions lengthened the investigation.

The trial court's remand to Commerce was precipitated by Essar's belated admission—after the imposition of adverse facts—relating to its Chhattisgarh facility and the court's independent identification of Essar's lack of eligibility for benefits under the CIP. The trial court did not conclude that the application of adverse facts, in light of the record before Commerce was improper. In fact, the trial court held that "the court accepts that Essar did not act to the best of its ability during the review with regard to this issue." J.A. 2472. The trial court was aware of Essar's application for CIP benefits and the government of Chhattisgarh's denial of those benefits because of an administra-

tive review in a different year where Essar did admit the existence of a plant in Chhattisgarh and did submit those documents into the record. *Essar*, 721 F. Supp. 2d at 1300. The trial court then asked the government if it would voluntarily remand this case for consideration of those additional documents. J.A. 2472. The government declined to do so. The government explained that it would not seek a voluntary remand and reopen the record because "Essar had an opportunity to place this document in the administrative record for the 2007 period of review, which Commerce conducted between January 26, 2008, and May 6, 2009, a period that includes and extends beyond the date of that letter." J.A. 1628. The government further explained that the agency makes its decision solely on the basis of the record; that the government should not consider evidence not timely filed; that Essar had the responsibility to create an accurate record; Essar had these documents and chose not to submit them; and Essar failed to cooperate and gave false statements. J.A. 1628. After the government declined to voluntarily remand and reopen the record, the trial court ordered Commerce to reopen the administrative record, place two letters—Essar's application for CIP benefits and the government of Chhattisgarh's denial of benefits—on the record, and "consider these documents in its reassessment of whether Essar benefitted from Chhattisgarh's Industrial Program." *Essar Steel*, 721 F. Supp. 2d at 1301. The trial court explained that the evidence "strongly impugn, if not outright refute, the Department's determination that Essar benefitted" from the CIP. *Id.* at 1300. The government argues that the trial court exceeded its authority when it ordered Commerce to reopen the record and admit the documents in this case. We agree.

It is Essar's burden to create an accurate record during Commerce's investigation. *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993). Commerce

must consider all information timely filed by interested parties. 19 C.F.R. § 351.301(c)(3)(ii). The trial court then reviews the record, which consists of "a copy of all information presented to or obtained by [Commerce] during the course of the administrative proceeding." 19 U.S.C. § 1516a(b)(2)(A). The record on review did not include Essar's request for benefits under the CIP, nor the government of Chhattisgarh's denial of those benefits. The record on review included Essar's repeated dishonest denials of a facility in Chhattisgarh, as well as Commerce's questionnaire including a press release contradicting those statements.

To allow constant reopening and supplementation of the record would lead to inefficiency and delay in finality. The Supreme Court has stated:

> Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed]. . . . If, upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Counsel, Inc.*, 435 U.S. 519, 554–55 (1978) (citations omitted); *see also Co-steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004) (Interest of finality of agency decisions is best served by not reopening and supplementing the record.).

We have carved out a small number of exceptions when we allow supplementation of an agency record. For example, one exception is to allow a remand to supplement the record when "the original record was tainted by fraud." *Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1379 (Fed. Cir. 2011). We have also made an exception and allowed supplementation when the underlying agency decision was based on "inaccurate data" that the "agency generating those data indicates are incorrect." *Borlem S.A.- Empreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990). The present case does not fall into one of these exceptions, nor does it merit the creation of a new exception.

Certainly Commerce could have requested that the trial court remand to allow them to reopen the record if it believed that was warranted. The trial court could have remanded the case to Commerce with instructions for Commerce to decide *whether* to reopen and supplement the record.[1] It was improper in this case, however, for the trial court to remand and *require* that Commerce reopen and supplement the record. The government is correct that the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance.

Commerce generally does not consider untimely filed factual information. 19 C.F.R. § 351.302(d)(1) ("[T]he Secretary will not consider or retain in the official record of the proceeding . . . untimely filed factual information . . . ."); *QVD Food Co. v. Int'l Trade Comm'n*, 658 F.3d 1318 (Fed.

---

[1] It would have been futile in this case given that the trial court asked Commerce to seek a voluntary remand and to reopen the record and Commerce indicated that it would not do so.

Cir. 2011) (Commerce correctly declined to rely on late-filed evidence.). Important principles of timeliness and finality undergird all aspects of litigation. Essar had an opportunity to present its evidence regarding the CIP subsidies to Commerce during the review. Instead it denied having a plant in Chhattisgarh. Only after the record closed, after adverse facts were applied, after the case was being reviewed by the trial court, these documents surfaced. In light of the facts of this case, Commerce did not err when it declined to reopen the record after it had long since closed to accept evidence that Essar at all times had and had refused to provide. The decision to reopen the record is best left to the agency, in this case Commerce. We cannot conclude that the agency abused its discretion by refusing to reopen the record and admit the evidence in this case. In light of this, the trial court exceeded its authority when it ordered the agency to do so.

Commerce's application of adverse facts against Essar was appropriate. We have recognized Commerce's authority to apply adverse facts, even when a party provides relevant factual information if a party has not acted to the best of its ability to provide the information. In *Nippon Steel*, Nippon Steel withheld relevant information from Commerce after Commerce asked for it twice during the investigation. 337 F.3d at 1383. Nippon Steel provided the information to Commerce only after Commerce published its preliminary results, which applied adverse facts against Nippon Steel. *Id.* at 1378. Because Nippon Steel did not timely file the information, Commerce chose not to accept it, and instead upheld its application of adverse facts against Nippon Steel in its final results. *Id.* The Court of International Trade, after several remands to Commerce, ordered Commerce to use the late-filed information, instead of adverse facts. *Id.* at 1379. We reversed the Court of International Trade's decision, and held that Commerce's decision to apply ad-

verse facts was supported by substantial evidence. *Id.* at 1385.

The only difference between *Nippon Steel* and this case is that here, it was the trial court, not Essar, who identified the late-filed documents. That does not change the fact that Commerce's application of adverse facts was supported by substantial evidence and should have been upheld. The Court of International Trade exceeded its authority when it ordered Commerce to reopen and expand the agency record. Article III courts are different from Article I agencies, and we must be ever mindful that we not usurp their role in this process.

CONCLUSION

We conclude that the trial court properly affirmed Commerce's imposition of countervailing subsidies for Essar's purchase of iron ore from NMDC and participation in the SEZ Act, but it erred in remanding the issue of benefits from the CIP. Accordingly, we affirm the Court of International Trade's decision with respect NMDC and SEZ Act, and reverse the Court of International Trade's decision with respect to the CIP. Commerce's decision to apply adverse facts was supported by substantial evidence.

**AFFIRMED-IN-PART AND REVERSED-IN-PART**

COSTS

Costs to Defendants-Cross Appellants.

# United States Court of Appeals
# for the Federal Circuit

_____

**ESSAR STEEL LIMITED,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Cross Appellant,*

**and**

**UNITED STATES STEEL CORPORATION,**
*Defendant-Cross Appellant.*

_____

2011-1270,-1271,-1289
_____

Appeal from the United States Court of International Trade in Case No. 09-CV-0197, Judge Judith M. Barzilay.

_____

NEWMAN, *Circuit Judge*, dissenting in part, concurring in the judgment.

I agree with the court's conclusion, but write separately to state my disagreement with the ruling that "the trial court exceeded its authority when it ordered Commerce to reopen the record and admit the documents in this case." Op. at 15. Surely it is within the authority of the trial court to assure, in its sound discretion, that the record includes the documents here at issue, documents that were in the

possession of the trial court and the agency from a prior review, and that concededly are relevant. Such a discretionary instruction, serving to enlarge the agency record on the specific point at issue, is not appropriate for appellate revocation.

I do not condone the provision of misinformation by Essar Steel. However, the action of the Court of International Trade to assure that this potentially correct information is before the agency was not an improper action. Although my colleagues deplore "allow[ing] constant reopening and supplementation of the record," op. at 16, here there was one reopening and supplementation, not "constant." In *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990) this court observed that "deference is not owed to a determination that is based on data that the agency [knows to be] incorrect. The law does not require, nor would it make sense to require, reliance on data which might lead to an erroneous result." The Court of International Trade's observation that "Commerce's determination in the sixth administrative review that Essar did not benefit from the Chhattisgarh Industrial Policy, and the Department's concurring admissions during oral argument, cast grave doubt upon the present findings," 721 F. Supp.2d at 1300, surely supports entry of these documents into the record for this review. The Court of International Trade did not exceed its authority, in requiring Commerce to receive this evidence into the record.

The Court of International Trade acted within its authority for agency review. *See, e.g., Rhone Poulenc, Inc. v. United States*, 880 F.2d 401, 402 (Fed. Cir. 1989) (28 U.S.C. § 1585 confers upon the Court of International Trade "all the necessary remedial powers in law and equity possessed by other federal courts established under Article III of the Constitution"); *Borlem*, 913 F.2d at 936-937 ("The Court of

International Trade has broad authority under 28 U.S.C. § 2643(c)(1) to require the Commission to reconsider its actions.").

Of course, I do not propose that Commerce must always receive additional information. However, when the trial court so requires, within its discretionary authority, it is not a "usurpation of agency power" for the court to exercise its statutory obligations. Even were this court to believe that the Court of International Trade was unduly tolerant of Essar's misstatements during Commerce's investigations, this benevolence does not warrant appellate discipline. From the panel's determination that the trial court exceeded its authority, I respectfully dissent.