**Slip Op.14- 19**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

ZHAOQING NEW ZHONGYA ALUMINUM
CO., LTD. AND ZHONGYA SHAPED
ALUMINUM (HK) HOLDING LTD.,

        Plaintiffs,

        and

EVERGREEN SOLAR, INC.,
        Plaintiff-Intervenor,

        v.

UNITED STATES,

        Defendant,

        and

ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,
        Defendant-Intervenor.

Before: Donald C. Pogue,
      Chief Judge

Court No. 11-00181

[Department of Commerce's Remand Results are AFFIRMED]

        Dated: February 19, 2014

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch,
Civil Division, U.S. Department of Justice, of Washington, DC,
for Defendant. With her on the briefs were Stuart F. Delery,
Acting Assistant Attorney General, Jeanne E. Davidson, Director,
and Reginald T. Blades, Jr., Assistant Director. Of counsel on
the briefs was Joanna Theiss, Attorney, Office of the Chief
Counsel for the Import Trade Administration, U.S. Department of
Commerce, of Washington, DC.

Alan H. Price, Derick G. Holt, Laura El-Sabaawi, Maureen E. Thorson, Robert E. DeFrancesco, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor, Aluminum Extrusions Fair Trade Committee.


**OPINION**

**Pogue, Chief Judge:**  This case returns to court following a remand ordered by Zhaoqing New Zhongya Aluminum Co. v. United States, __ CIT ___,929 F. Supp. 2d 1324 (2013)("Zhaoqing Remand").  The Zhaoqing Remand required the Department of Commerce ("Commerce" or "the Department") to review the proper benchmark for measuring the value of the subsidy provided to New Zhongya Aluminum Company, Ltd. and its affiliates (collectively "New Zhongya") in the form of land use rights in the Zhaoqing High-Technology Industry Development Zone ("ZHTIDZ") in China. The Department responded to the Zhaoqing Remand by issuing Final Results of Redetermination Pursuant to Court Remand, ECF No. 75 (Aug. 21, 2013) ("Remand Results").

In the Remand Results, Commerce revised its initial determination to use the price of developed industrial land in Thailand as a benchmark for valuing New Zhongya's subsidy and accepted instead the indicative price of land in the Subic Bay Freeport Zone in the Philippines ("Subic Bay") as reported by the private firm Coldwell Banker Richard Ellis. Remand Results at 7.

Defendant-Intervenor, the Aluminum Extrusions Fair Trade Committee ("AEFTC") now raises two challenges to the determination in the Remand Results.[1] AEFTC first claims that the use of property in the Philippines as a benchmark for the subsidy received by New Zhongya is contrary to the Department's practice and precedent. AEFTC's second claim is that there is insufficient record evidence on the Philippines to support the use of Subic Bay as a benchmark, and that Commerce must therefore reopen the administrative record in order to reasonably support its selection.

As explained below, the selection of lower infrastructure properties in Subic Bay as a land value benchmark is a reasonable response to the Zhaoqing Remand. While the Department selected Subic Bay without reference to the full range of evidence used in some prior comparable cases, its decision is neither inconsistent with the Department's precedent and practice nor unreasonable.

The second objection raised by AEFTC also fails. While additional record evidence regarding either Subic Bay or comparably undeveloped Thai land could produce a more accurate estimate of the New Zhongya subsidy, the facts in this case do

---

[1] Neither Plaintiffs Zhaoqing New Zhongya Aluminum Co. and Zhongya Shaped Aluminum Holding, nor Plaintiff-Intervenor Evergreen Solar have challenged the Remand Results.

not show that Department's refusal to accept such evidence was an abuse of discretion.

The court continues to hold jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

**BACKGROUND**

As part of its investigation of certain aluminum extrusions from the People's Republic of China ("China" or the "PRC"), the Department concluded, inter alia, that countervailing duties were appropriate to offset the subsidy given to New Zhongya in the form of reduced costs for land use rights in the ZHTIDZ. See Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (affirmative countervailing duty determination) and accompanying Issues & Decision Mem., C-570-968 (Mar. 28, 2011) ("I&D Memo") at cmt. 23. Based on the impossibility of finding an adequate domestic or international market price with which to compare ZHTIDZ land use rights, Commerce determined that it was appropriate to employ a "third tier" method and calculate the subsidy value by comparing the price that New Zhongya paid for its land use rights with market-based prices for comparable land in a country at a similar level of economic development and in reasonable

proximity to the PRC.[2] Remand Results at 2.  For this comparison,
the Department selected "indicative land values" from a fully
developed industrial park in Bangkok, Thailand, as a benchmark.
I&D Memo at cmt. 24.  These indicative values were taken from a
Coldwell Banker Richard Ellis (CBRE) Industrial Property Guide,
part of a series of industry reports produced by a commercial
real estate services firm operating across Asia.[3] Id.

New Zhongya challenged the use of the Thai benchmark during
the administrative review and on appeal to this court.  New
Zhongya argued that the benchmark Thai industrial land was not
comparable to the sites made available in the ZHTIDZ as required
by 19 U.S.C. § 1677 and 19 C.F.R. § 351.511(a). Pl. Mot. for
Judgment on the Agency Record ECF No. 44 ("Pl's Mot.") at 4.

---

[2] Commerce had earlier determined that the provision of land use
rights of this type constitutes a countervailable subsidy and
developed its justification for using a third country comparison
to estimate the size of the subsidy in accordance with § 771(5)
of The Tariff Act of 1930, 19 U.S.C. § 1677(5) (all further
references to the Tariff Act of 1930, as amended, are to the
relevant portions of Title 19 of the U.S. Code, 2006 edition)
and 19 C.F.R. § 351.511. See Laminated Woven Sacks From the
People's Republic of China, 72 Fed. Reg. 67,893 (Dec. 3, 2007)
(Preliminary Affirmative Determination) ("LWS from the PRC") at
67,905, affirmed in Laminated Woven Sacks From the People's
Republic of China, 73 Fed. Reg. 35,639 (Jun. 24, 2008) (Final
Affirmative Determination) at cmt. 11.

[3] A description of CBRE and the range of commercial real estate
services they provide to investors throughout Asia appears at
CBRE Industrial MarketView 2Q 2007, ECF No. 82-2 at 69.
Commerce has relied upon CBRE reports for land value questions
in previous cases. LWS from the PRC at 67,908-09.

New Zhongya claimed that several differences precluded any valid comparison between these sites.  The most significant of these differences was the highly developed state of physical infrastructure available at the Bangkok site compared to the ZHTIDZ. Id. at 5.  To correct this alleged error in the Department's analysis, New Zhongya advocated either the use of indicative industrial land prices from the Subic Bay Freeport development site in the Philippines or a downward adjustment to the indicative prices for the Thai sites. Confidential Response in opposition to motion for judgment on the agency record ECF No. 55 at 8.  The dispute over this determination centered on the evidence used by the Department to evaluate the infrastructure available at the ZHTIDZ site when taken over by New Zhongya.

The Zhaoqing Remand ordered reconsideration or further explanation of the Department's rationale for using the indicative values given in the CBRE Reports for Thai industrial land. See Zhaoqing Remand, 929 F. Supp. 2d at 1327-29.  The record evidence did not adequately support the Department's use of industrial real estate in Thailand that was already equipped with extensive physical and logistical infrastructure as a benchmark for comparison with land in the ZHTIDZ that required extensive improvement by New Zhongya before productive use.

Specifically, the court ruled that the Department's determination was unreasonable in its reliance on two pieces of relatively ambiguous evidence – a promotional web site and a series of photographs the provenance of which could not be established – when this evidence was contradicted by substantial other material on the record.[4] Id. at 1328-29.

In its Remand Results, the Department declined to further analyze or adjust the Thai benchmark, and instead elected to use indicative values for land in Subic Bay as a more appropriate benchmark for the value of New Zhongya's land use subsidy. Remand Results at 11.  In doing so, the Department selected indicative values from the CBRE Report for Subic Bay sites that offered no specific information on levels of infrastructure.[5]

---

[4] The ruling highlighted the unreasonable reliance on the claims of a promotional web site, and a series of photographs that could not be precisely dated, to indicate a high level of infrastructure development for ZHTIDZ land when considered in light of the extensive record submissions demonstrating a lower level of infrastructure in place when New Zhongya began its lease of the property in 2006. Zhaoqing Remand, 929 F. Supp. 2d. at 1327-28 (citing Pl's Mot. at 5 and Zhongya Supplemental Questionnaire Resp. at 297).

[5] This decision was based on the fact that the CBRE reports listed two types of industrial land.  One of these types was labeled "infrastructure in place," while the other had no information on level of industrial amenities or development at all.  Remand Results at 6.  The Department inferred that the lack of a label could be taken as evidence that these sites had a lower level of infrastructure and were therefore more comparable to the ZHTIDZ land acquired by New Zhongya. Id.

The subsidy and the appropriate countervailing duty were then recalculated using this benchmark.

Responding to comments from the parties, the Department determined that its decision to use the Philippines rather than Thailand as an appropriate benchmark country for comparison with China was case-specific and that Thailand would continue to be used as the default national comparison for the reasons explained in LWS from the PRC. Id. at 9. In addition, the Department rejected the Defendant-Intervenor's requests that it reopen the administrative record and gather either additional information on sites in Thailand or macroeconomic and demographic data that would support the use of the Philippines with data comparable to that gathered before selecting Thailand as the default comparison country in LWS from the PRC. Id. at 7, 9.

AEFTC now challenges the Department's determination on remand, claiming first that LWS from the PRC established a procedure for selecting an appropriate third country for comparison with China in less than adequate remuneration ("LTAR") subsidy cases. Defendant-Intervenor argues that, as a controlling practice or precedent, LWS from the PRC requires Commerce to re-open the administrative record and develop additional data to justify the selection of benchmark land

values from the Philippines. Comments of the AEFTC on the Department of Commerce's Final Results of Redetermination, ECF No. 77 ("AEFTC Comments") at 5.

AEFTC's second claim is that the inadequacy of the record data on the Subic Bay site prevents the Department from making a reasonably accurate estimate of the ZHTIDZ land value subsidy. This inadequacy, AEFTC alleges, can only be dealt with by reopening the administrative record and accepting additional submissions that would improve the accuracy of the benchmark, specifically information on inflation rates in the Philippines during the period. Id. at 6-7.

## STANDARD OF REVIEW

"The court will sustain the Department's determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938)).  Accordingly, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). In doing so, the court must consider any fact that "fairly detracts from [the agency conclusion's] weight." Universal Camera Corp., 340 U.S. at 488.  As importantly, a reviewing court may not "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Id.

**DISCUSSION**

I.   The Selection of the Philippines as a Benchmark Country

The first of AEFTC's claims is unpersuasive.  AEFTC argues that the use of the Philippines for comparison with the PRC is unreasonable because the Philippines was not selected through the same process and in consideration of the same factors that were used in LWS from the PRC to identify Thailand as an appropriate benchmark country. AEFTC Comments at 4.

Invoking the principle articulated in Hussey Copper, Ltd. v. United States, 17 C.I.T. 993, 997, 834 F. Supp. 413, 418

(1993), that agencies deviating from their own established practices must offer an adequate explanation for treating similar situations differently,[6] AEFTC argues that the selection of the Philippines benchmark for industrial land values can only be justified by the same process of investigation and in consideration of the same factors used to identify Thailand as a valid comparison country in LWS from the PRC. AEFTC Comments at 4-5. In support of this claim, AEFTC points out that the Department intends to use the Philippines as a benchmark only in this case and that the Department retains a preference for Thai comparisons. Id. at 4 (citing Remand Results at 7-8). The Department's intention, AEFTC suggests, indicates clearly that the Department itself lacks confidence in the validity of the Philippines as a comparable market for industrial land. Id. at 5.

---

[6]Hussey Copper, quoting Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988), articulated the "general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure." AEFTC neglects the context of this citation, which continues directly: "[t]his rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of a statute." Id. The court in Hussey Copper elaborated further, emphasizing the Department's "broad discretion in its selection of methodology to implement the statute" so long as this discretion is not abused or employed in an arbitrary manner. Id. Thus Hussey Copper supports, rather than limits, reasonable consideration of the facts in each case to inform the Department's reasonable methodological choices.

To correct this alleged error, AEFTC argues that the Department must either conduct a more detailed investigation of the Philippines to justify its use as a benchmark for Chinese industrial land values or gather more information on industrial properties in Thailand that lack significant infrastructure and therefore meet the requirements of the remand. Id. at 5, 6.

The Department acknowledges that the Philippines was not chosen through a process of investigation as rigorous or detailed as that used in LWS from the PRC and that record evidence on the Philippines is limited. Remand Results at 7; Def.'s Response to Comments Regarding the Remand Redetermination, ECF No. 80 ("Def.'s Response") at 7. The Department argues, however, that it is not compelled to follow the LWS from the PRC process in selecting comparable countries for comparison. Commerce specifically notes that LWS from the PRC reserves the Department's prerogative to make future determinations based on a range of factors appropriate to each case, including the availability of data. Remand Results at 7-8; Def.'s Response at 8.

Electing not to gather additional data, the Department argues that the only information presently on the record that offers price data on land not specifically known to be developed for industrial use comes from the 2007 CBRE Report and that such

data is only available for Subic Bay in the Philippines. Remand Results at 7-8.  Since the remand found the Department's use of prices for developed industrial land with significant existing infrastructure to be unjustified, the Department argues that the selection of the Philippines is reasonable. Id.

The Department is correct.  While not as well grounded in record evidence as the selection of Thailand in LWS from the PRC, the Department's selection of the Philippines as a comparison country is not contrary to the Department's practice and precedent.  In LWS from the PRC, the Department examined several factors before reaching the conclusion that Thailand provided the best benchmark for the subsidies provided by LTAR land programs, including relative wealth, (represented by gross national income per capita), population density, industrial density, and the perceptions of foreign investors (represented by reports from the Japan External Trade Organization as well as the private firm CBRE). LWS from the PRC at 67,909.

While the procedures used in this determination have continued to guide the Department in some proceedings,[7] they were

---

[7] See, e.g., Citric Acid and Certain Citrate Salts From the People's Republic of China, 79 Fed Reg. 108 (Dep't of Commerce Jan. 2, 2014) (final results of administrative review, 2011) and accompanying Issues & Decision Mem., A-570-937 (Dec. 26, 2013) at 28, n. 168.

clearly not intended to establish a general policy for all land LTAR investigations.  Rather, the choice of Thailand in LWS from the PRC was at least in part driven by its economic similarity to China's Shandong Province where the firms under investigation had received their land use subsidies.  This indicated that the selection of Thailand was not intended to set a new departmental policy for all LTAR calculations involving any Chinese industrial land, but was instead tailored to the facts of the LWS from the PRC case.[8] Id.  To clarify this, the determination in LWS from the PRC also emphasized both that the Department might choose to rely upon other factors in future decisions regarding LTAR land value comparisons and that the process of developing a general policy to account for such land subsidies was ongoing. Id.

Relying on such other factors is exactly what the Department has done in this case.  Specifically, in adopting

---

[8] Shandong's GNI per capita and population density, both significantly above the Chinese national average, were found to be nearer to the Thai levels and therefore to make Thailand a better comparison. Id.  The land at issue in the instant aluminum extrusions investigation is in Guangdong Province near Hong Kong. I&D Memo at cmt. 13.  The emphasis on this regional difference undermines the presumption that the Thai comparison developed by the Department for LWS from the PRC should by default be applied here, Id. at cmt. 24, and contradicts AEFTC's claim that the department has a general "stated policy to use Thai benchmarks to value PRC land LTAR programs" that is here being disregarded. AEFTC Comments at 6.

Subic Bay as a benchmark in response to the Zhaoqing Remand, the

Department relied on the inclusion of the Philippines in the

CBRE Report to determine that the country is sufficiently

comparable to China for this purpose without prejudicing its

decisions in the future.[9] Remand Results at 9. Though the

criticisms raised by the AEFTC are not unreasonable, nothing in

LWS from the PRC requires a different result.

    II.   The Department's Refusal to Reopen the Administrative
           Record to Improve the Accuracy of the LTAR Benchmark

---

[9] In the linked antidumping investigation, the Department found the Philippines to be comparable to China in its level of economic development as part of a review required to establish surrogate values for factors of production under 19 U.S.C. § 1677b(c)(4)(B). See Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011) (final determination of sales at less than fair value) and accompanying Issues & Decision Memorandum, A-570-967 (Apr. 4, 2011) at cmt. 1(F) (defending the use of the Philippines as one of several surrogate countries to establish a market economy wage rate). This finding of economic comparability has been relied upon both in other investigations, e.g. Certain Steel Threaded Rod from the People's Republic of China, 77 Fed. Reg. 27,022 (May 8, 2012) (preliminary results of administrative review) at 27,025, and in the most recent administrative review of the Aluminum Extrusions case. Aluminum Extrusions from the People's Republic of China, 79 Fed. Reg. 96, (Dep't Commerce Jan. 2, 2014) (final results of antidumping duty administrative review and rescission) and accompanying Issues & Decision Mem., A-570-967 (Dec. 26, 2013) at cmt. 1. These findings demonstrate that Commerce generally considers the national economy of the Philippines to be similar to that of China, supporting the reasonableness of Commerce's choice here to use Philippines data as a benchmark for estimating the value of the subsidy provide by the LTAR program.

AEFTC also objects to the adequacy of information available on the record about the Philippines as a basis for comparison with ZHTIDZ. AEFTC Comments at 6.[10]  AEFTC makes both the general argument that the lack of record data prevents the Department from making a reasonably accurate estimate of the ZHTIDZ land value subsidy and the specific argument that inflation data on the Philippines must be collected in order to establish a subsidy estimate as accurate as the Thai benchmark that would normally be used.  To accomplish this, AEFTC argues that the Department should be required to reopen the administrative record in order to provide the foundation for a more precise valuation. Id.  AEFTC notes that the Department may reopen the record in response to a remand and argues that it would be appropriate to do so in this case to advance the purpose of the remand. Thai Plastic Bags Indus. Co. v. United States, __ CIT ___, 895 F. Supp. 2d 1337, 1346 (Ct. Int'l Trade 2013); Qingdao Sea-Line Trading Co., Ltd. v. United States, Slip Op. 13-102 (CIT Aug. 8, 2013).  The Defendant's response, in contrast, emphasizes that the Department has the discretion to reopen the record and that the determination of when it is appropriate to do so is properly left to the Department. Def.'s Response at 7,

---

[10] In its redetermination, Commerce found that the Subic Bay sites had a level of infrastructure lower than the Thai sites. Remand Results at 7. No party challenges this finding.

citing <u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v.
United States</u>, 33 C.I.T. 695, 625 F. Supp. 2d 1339, 1356 n. 18
(2009).

AEFTC's most specific argument for compelling the
Department to reopen the record is the lack of any data that
would allow the Department to apply an appropriate discount for
Philippine inflation to the <u>CBRE Report's</u> indicative values for
Subic Bay properties.  In setting out their case, however, AEFTC
goes beyond the issue of accurately accounting for inflation and
cites three admissions by the Department that adequate data on
investor perceptions and Philippine demography are not available
to conduct an investigation of the Philippines comparable to
that conducted of Thailand in <u>LWS from the PRC</u>.[11] AEFTC Comments
at 6.  Though not clearly stated, the argument suggests that it
is impossible to establish an accurate benchmark for the ZHTIDZ
land use subsidy without these data and that the only way to
deal with this problem is to reopen the administrative record
and gather sufficient information to conduct an investigation of
the Philippines comparable to <u>LWS from the PRC</u>.

---

[11] AEFTC correctly identifies the three types of evidence used by
Commerce in <u>LWS from the PRC</u> that established Thailand as an
adequate benchmark in that case – macroeconomic data,
demographic information, and a study of the perceptions of
foreign investors.

No party contests the Department's finding that the Subic Bay benchmark has a lower level of infrastructure in place than the Thai properties originally used and is therefore more comparable to ZHTIDZ. See supra n. 9.  It follows that we must reject AEFTC's argument.  Because the Department is not compelled by its own procedures or the demands of substantial evidence to conduct a study of the Philippines comparable to LWS from the PRC, the information on investor perceptions and Philippine demography highlighted by AEFTC is not necessary.  It would be illogical to remand based on the failure to collect information that the Department has demonstrated it does not need.

This leaves AEFTC's specific objection to the Department's failure to correct the Philippines price data provided in the CBRE Report for inflation.  AEFTC argues that the lack of data on inflation of the Philippine peso prevents the Department from discounting the Subic Bay land values for the period that separates the CBRE Report estimates of 2007 from the 2006 acquisition of the ZHTIDZ land by New Zhongya. AEFTC Comments at 7.  Since the Thai land prices were so discounted in response to criticism, AEFTC argues that failing to reopen the record in order to discount Philippine price data is not reasonable. Id., citing I&D Memo at cmt. 24.

The Department's defense of its decision not to discount for inflation rests on the relatively short time separating New Zhongya's acquisition of land use rights in June and October of 2006 and the second quarter of 2007 from which the indicative values in the CBRE Report were drawn.[12] Remand Results at 10; Def's Response at 9.

Again the Department is correct.  Neither the Department's failure to discount Philippine prices for inflation over a period of between eight months and one year, nor its refusal to reopen the record to gather such information, can be considered unreasonable.

Three factors support the conclusion that Commerce is operating within the bounds of its discretion.  First, though the Department did discount the Thai benchmark real estate prices for inflation in its original determination, AEFTC does not allege that the Department has violated an established methodology or practice by failing to do so here. I&D Memo at cmt. 24.

Second, the Department's decision to discount Thai property values in the Final Determination is differentiable from the

_____

[12] The specific table in the CBRE Report from which the indicative values for Subic Bay properties are taken labels these as prices at the close of the second quarter of 2007. CBRE Report at 12, ECF No. 82-2 at 66.

decision not to do so for the Philippines along precisely the lines invoked by the Department.  The Thai land values used in the Final Determination are drawn from a CBRE Report citing prices in the first quarter of 2008 rather than the second quarter of 2007. Id.  This is entirely consistent with the Department's explanation that the shorter time period justifies a different decision.

Third, if the Department had determined that discounting for Philippine inflation were appropriate, evidence presently on the record could provide a basis for doing so.  The CBRE Report from which the Subic Bay indicative values were drawn provides an inflation rate of 2.4% for the Philippine peso as of May 2007.[13] CBRE Report at 1, ECF No. 82-2 at 55.  While it is unclear from the Department's submissions why it would be inappropriate to use this number to discount the Subic Bay values, its presence on the record invalidates AEFTC's claim that reopening the record would be the only way to address the inaccuracy introduced into the subsidy estimate by inflation.

---

[13] The CBRE Report provides both the headline inflation rate of 2.4% and a core inflation rate of 2.6%.  It also presents an explanation for the divergence between core and headline figures based on recent tax changes as part of its general discussion of the investment environment of the Philippines.  It is puzzling that neither party addresses the existence of these numbers on page 1 of the CBRE Report before moving on to arguments over the necessity of reopening the administrative record to collect inflation data.

Taken together, these factors undermine AEFTC's argument that the Department should be compelled to reopen the administrative record to account for inflation.  Since Commerce's benchmark selection was not unreasonable, the Department's failure to reopen the record was not an abuse of discretion. Sterling Fed. Sys., Inc. v. Goldin, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting Gerritsen v. Shirai, 979 F.2d 1524, 1529 (Fed. Cir. 1992)) (stating that an agency abuses discretion, inter alia, when its determination "follows from a record that contains no evidence on which the [agency] could rationally base its decision." (alteration in original))  See Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012)(emphasizing the high threshold for overturning the Department's decisions regarding the collection of record evidence).

**CONCLUSION**

For the foregoing reasons, the Department's selection of the Subic Bay indicative land value as a benchmark for estimating the subsidy provided to New Zhongya by land use rights in the ZHTIDZ is affirmed. Judgment shall be issued accordingly.

It is so ORDERED.

                                        __/s/ Donald C. Pogue_____
                                        Donald C. Pogue, Chief Judge


Dated: February 19, 2014
New York, NY